Javier L. Merino (NJ Bar 078112014)
**The Dann Law Firm, PC**
825 Georges Road, Second Floor
North Brunswick, NJ 08902
Telephone: (201) 355-3440
Facsimile: (216) 373-0536
notices@dannlaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ISMAEL GOMEZ, PABLO VAZQUEZ, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,
v.

PERSANTE HEALTHCARE, INC.,

Defendant.

Case No. 1:25-cv-18203

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

# CLASS ACTION COMPLAINT

Plaintiff Ismael Gomez ("Plaintiff Gomez") and Pablo Vazquez ("Plaintiff Vazquez," and with Plaintiff Gomez, "Plaintiffs") on behalf of themselves and all others similarly situated, bring this Class Action Complaint (the "Action") against Persante Healthcare, Inc. ("Persante" or "Defendant"), and alleges upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this class action complaint against Persante for its failure to secure and safeguard personally identifiable information and personal health information ("Private Information") that was entrusted to Persante.

2. Between January 23, 2025 and January 28, 2025, Persante experienced a

cyberattack of its computer network. This cyberattack resulted in the breach and/or compromise of certain files containing the sensitive personal data of Plaintiffs and thousands of other individuals, including but not necessarily limited to first and last names, addresses, dates of birth, driver's license numbers, other federal and state government-issued identification numbers (e.g., passport numbers), Social Security Numbers, financial Information (e.g., account numbers, credit card numbers, and debit card numbers), medical information, and Protected Health Information; and health insurance information (the "Data Breach").

3. Persante is a health care provider in New Jersey. Persante, as a substantial business, had the resources to take seriously the obligation to protect Private Information. However, Persante failed to invest the resources necessary to protect the Private Information of Plaintiffs and Class members.

4. The actions of Persante related to this Data Breach are unconscionable. Upon information and belief, Persante failed to implement practices and systems to mitigate the risks posed by Persante's negligent (if not reckless) IT practices. As a result of these failures, Plaintiffs and Class members face a litany of harms that accompany data breaches of this magnitude and severity.

5. As such, Plaintiffs, on behalf of themselves and all others similarly situated, bring this Action for restitution, actual damages, nominal damages, statutory damages, injunctive relief, disgorgement of profits, and all other relief that this Court deems just and proper.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this Action under 28 U.S.C. § 1332(d), the Class Action Fairness Act. This is a civil action filed as a class action under Rule 23 of the Federal Rules of Civil Procedure, the proposed Class consists of at least 100 members,

the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one member of the Class, including each of the Plaintiffs, is a citizen of a state different from Defendant.

7. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is 200 East Park Drive, Suite 600, Mt. Laurel, New Jersey and a substantial part of Defendant's conduct giving rise to this action took place in the state of New Jersey.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident in this District.

## III. PARTIES

9. Plaintiff Gomez is, and at all times relevant to this action was, a resident of the state of Connecticut. Plaintiff is and was a patient whose sleep-related care was managed by Persante in connection with services provided at a medical facility in Connecticut. On or about November 26, 2025, Plaintiff Gomez received a notice from Persante informing him that his Private Information was compromised in the Data Breach. As a result, Plaintiff has experienced an increase in spam calls and spam emails following the breach. Additionally, someone tried to open accounts in his name with Wells Fargo and Chase, and Plaintiff Gomez was notified by Experian that his personal information was found on the dark web. Plaintiff Gomez has taken mitigation steps including contacting his bank, and placing fraud alerts and security freezes with all three major credit bureaus. Additionally, Plaintiff Gomez has spent time monitoring his accounts for fraud, experienced anxiety and emotional distress, and faces ongoing risks of identity theft.

10. Plaintiff Vazquez is, and at all times relevant to this action was, a resident of the state of Connecticut. Plaintiff is and was a patient whose sleep-related care was managed by Persante in connection with services provided at a medical facility in Connecticut. On or about

November 26, 2025, Plaintiff Vazquez received a notice from Persante informing him that his Private Information was compromised in the Data Breach. Plaintiff Vazquez has taken mitigation steps as a result of the breach, including changing access information across platforms.

11. At all times material hereto, Persante is and was a New Jersey-based healthcare company, authorized to transact and regularly transacting for purposes of healthcare services in the state of New Jersey and beyond, with its principal place of business in New Jersey.

## IV. FACTUAL ALLEGATIONS

### A. Defendant's Business and Collection of Private Information

12. Persante is a health care provider that specializes in sleep health and operates more than 90 sleep diagnostic centers across the United States.[1]

13. Plaintiffs and the rest of the Class members received Persante's services, and, in so doing, entrusted Persante with their extremely sensitive and highly valuable Private Information, which Persante acquired from Plaintiff and the other Class members in the course of providing healthcare services to them.

14. In turning over their Private Information, Plaintiffs and Class members reasonably expected that Persante would safeguard their highly sensitive and valuable information and would make only authorized disclosures of this Private Information.

15. By obtaining, collecting, using, and deriving a benefit from Plaintiffs and Class members' Private Information, Persante assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the safety and security of Plaintiffs' and Class members' Private Information and for protecting such Private Information from unauthorized disclosure and exfiltration.

[1] https://persante.com/about-us/

**B. The Data Breach**

16. On or about January 28, 2025, Persante became aware of a cyberattack of its computer network. This cyberattack resulted in the breach and/or compromise of certain files containing the sensitive personal data of Plaintiffs and thousands of other individuals, including but not necessarily limited to first and last names, addresses, dates of birth, driver's license numbers, other federal and state government-issued identification numbers (e.g., passport numbers), Social Security Numbers, financial Information (e.g., account numbers, credit card numbers, and debit card numbers), medical information and Protected Health Information; and health insurance information.[2]

17. Not only do Plaintiff and Class members have to contend with the harms caused by the Data Breach, but Persante's response to the Data Breach has been woefully insufficient. In fact, according to the November 26, 2025 notice of data breach issued, it took Persante nearly ten months to notify Plaintiff and other Class members that the Data Breach compromised their personal health information and other Private Information.

18. On information and belief, the Private Information compromised in the Persante files accessed by the threat actors was not encrypted. In any event, the threat actors were able to access the Private Information listed above.

19. The access and/or acquisition of the Private Information from Persante's systems demonstrates that this cyberattack was targeted due to Persante's status as a business that houses sensitive Private Information. Armed with this Private Information, data thieves (as well as downstream purchasers of the stolen Private Information), can commit a variety of crimes, including as follows: opening new financial accounts in Class members' names, taking out loans

[2] https://persante.com/notice-of-data-security-incident/

in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' identification information, obtaining driver's licenses in Class members' names but with different photographs, and giving false information to police during any arrests.

20. Due to Persante's flawed security measures and Persante's incompetent response to the Data Breach, Plaintiffs and Class members now face a present, substantial, and imminent risk of fraud and identity theft and must deal with that threat forever.

21. Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of Private Information, and despite Persante's large operating budget, Persante maintained unreasonably deficient protections prior to the Data Breach, including but not limited to a lack of security measures for storing and handling Private Information, as well as inadequate employee training regarding how to access, oversee the protection of, and handle and safeguard this sensitive set of information.

22. Persante also failed to adequately adopt and train its employees on even the most basic of information security protocols, including storing, locking, encrypting, and limiting access to Plaintiffs' and Class members' highly sensitive Private Information; implementing guidelines for accessing, maintaining, and communicating sensitive Private Information; and protecting sensitive Private Information by implementing protocols on how to utilize, store, and handle such information.

**C. The Data Breach Was Foreseeable and Preventable**

23. Had Persante maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Persante could have safeguarded patient and patient data. Persante lack of security controls and implementation of enhanced security measures

only after the Data Breach are inexcusable.

24. Persante was at all times fully aware of its obligation to protect patients' PII/PHI and the risks associated with failing to do so. Persante knew that information of the type collected, maintained, and stored by Persante is highly coveted and a frequent target of hackers.

25. This exposure, along with the fact that the compromised PII/PHI is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:




26. By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[3]

27. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

[3] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, Javelin (Feb. 20, 2013), *available at* https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

28. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.

29. In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[4]

30. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[5]

31. In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[6]

32. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive

[4] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023), *available at* https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (last visited June 20, 2025).

[5] *Id.*

[6] *Id.*

in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[7]

33. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[8]

34. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[9]

35. The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity

---

[7] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited June 20, 2025).

[8] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf, (last visited June 20, 2025).

[9] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (Last visited June 20, 2025).

credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[10] Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web.[11] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[12]

36. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[13]

37. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual,

---

[10] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available* at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 20, 2025).

[11] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2 (last visited July 28, 2021).

[12] *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 20, 2025).

[13] *Identity Theft and Your Social Security Number* (Oct. 2024), SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 20, 2025).

ongoing fraudulent activity to obtain a new number.

38. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[14]

39. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

40. The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[15]

41. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

42. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime

---

[14] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 20, 2025).

[15] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 20, 2025).

Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

43. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

44. Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

45. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[16] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[17]

46. The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

**D. Defendant Failed to Follow FTC Guidelines and Industry Standards**

47. Federal and State governments have established security standards and issued

---

[16] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited June 20, 2025).
[17] *Id.*

recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[18]

48. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[19] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

49. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

---

[18] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited June 20, 2025).

[19] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.cliclaw.com/library/us-federal-laws/data-security/ftc-released-guide-protecting-personal-information-guide#:~:text=Protecting%20Personal%20Information%3A%20A%20Guide%20for%20Business%20October,card%20details%20to%20prevent%20fraud%20and%20identity%20theft (last visited June 20, 2025).

[20] *Id.*

[21] FEDERAL TRADE COMMISSION, *Start With Security*, *supra* note 17.

50. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

**E. Defendant Failed to Comply with HIPAA's Mandates**

51. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.103), and as such is required to comply with (a) the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information") and (b) the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

52. Defendant is also subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH")[22], 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

53. HIPAA's Privacy Rule (or Standards for Privacy of Individually Identifiable Health Information) establishes national standards for the protection of health information.

54. HIPAA's Security Rule (or Security Standards for the Protection of Electronic Protected Health Information) establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

55. HIPAA requires "compl[iance] with the applicable standards, implementation

---

[22] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

56. "Electronic protected health information" includes "individually identifiable health information … that is (i) transmitted by electronic media;" or (ii) maintained in electronic media." 45 C.F.R. § 160.103.

57. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

58. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

59. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses

or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. See 45 C.F.R. § 164.305(a)(1) and § 164.306(a)(3); see also 42 U.S.C. § 17902.

60. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[23]

61. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. §164.503(e).

62. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart (e) by the covered entity or its business associate. See 45 C.F.R. §164.530(e).

63. HIPAA also requires the Office of Civil Rights ("OCR") within the Department of Health and Human Services ("HHS") to issue annual guidance documents on the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[24] The list of resources includes a link to guidelines set by the National Institute of Standards

[23] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

[24] U.S. Department of Health & Human Services, Security Rule Guidance Material http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed Nov. 26, 2025).

and Technology, which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI."[25]

**F. Defendant's Breach of Its Obligations**

64. Defendant breached its obligations to Plaintiffs and Class members and was otherwise negligent and/or reckless because Defendant failed to properly maintain, oversee, and safeguard its computer systems, network, and data. In addition to its obligations under federal and state law, Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care when obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class members to provide reasonable security, including complying with industry standards and requirements, providing training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiffs and Class members.

65. Defendant's wrongful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect Plaintiffs' and Class members' Private Information;

c. Failing to implement updates and patches in a timely manner;

d. Failing to properly monitor third-party data security systems for existing intrusions, brute-force attempts, and clearing of event logs;

[25] U.S. Department of Health & Human Services, Guidance on Risk Analysis https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed Nov. 26, 2025).

e. Failing to ensure that all employees and third-parties apply all available and necessary security updates;

f. Failing to ensure that all employees and third-parties install the latest software patches, update their firewalls, check user account privileges, and ensure proper security practices;

g. Failing to ensure that all employees and third-parties practice the principle of least-privilege and maintain credential hygiene;

h. Failing to avoid the use of domain-wide, admin-level service accounts;

i. Failing to adequately oversee employees and third-party vendors;

j. Failing to ensure that all employees and third-parties employ or enforce the use of strong, randomized, just-in-time local administrator passwords; and

k. Failing to properly train and supervise employees and third-parties in the proper handling of inbound emails.

66. As the result of allowing its computer systems to fall into dire need of security upgrading and its inadequate procedures for handling cybersecurity threats, Defendant negligently and wrongfully failed to safeguard Plaintiffs' and Class Members' Private Information.

67. Accordingly, as further detailed herein, Plaintiffs and Class Members now face a present and ongoing imminent risk of fraud and identity theft.

**G. Data Breaches Are Harmful to Victims**

68. Persante's failure to keep Plaintiffs' and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class

Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

69. The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

70. Further, malicious actors often wait months or years before using the PII obtained in data breaches, as victims become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

71. Given the confirmed exfiltration of patient PII/PHI from Persante, many victims of the Data Breach have likely already experienced significant harms, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and searching for unauthorized activity.

72. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[26]

73. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[27]

74. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial

---

[26] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (May 2021), *available at* https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited June 8, 2025).

[27] *Id.*

> identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

75. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, a harm recognized by courts as an independent form of harm.[28]

76. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated or accessed by different criminal actors who intend to use it for various fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

77. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII/PHI without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII/PHI permitted by Defendant without

---

[28] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

their permission;

e. Identity theft and fraud resulting from the theft of their PII/PHI;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

78. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically involves significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims reported spending an average of 7 hours resolving issues related to identity theft or fraud.[29]

79. Plaintiffs and Class Members place significant value in data security. According to a survey conducted by cybersecurity company FireEye Mandiant,

[29] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited June 20, 2025).

approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[30]

80. Plaintiffs and Class Members have a direct interest in Persante's promises and duties to protect PII/PHI, i.e., that Persante would *not increase* their risk of identity theft and fraud. Because Persante failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Persante's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for Persante's wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PII/PHI.

81. Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through Persante's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed

---

[30] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited June 20, 2025).

such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law principles of damages, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

82. Plaintiffs and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as Persante continues to retain their PII.

## V. CLASS ALLEGATIONS

83. Plaintiffs brings this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b) and 23(c) of the Federal Rules of Civil Procedure. The "Class" that Plaintiffs seek to represent is defined as follows:

> All persons whose Private Information was maintained by Persante and was compromised in the Data Breach.

84. Excluded from the Class are Defendant and Defendant's subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

86. Numerosity. The Data Breach compromised Private Information of thousands individuals. Therefore, the members of the Class are so numerous that joinder of all members is impractical.

87. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common

questions of law and fact include, without limitation:

a. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

b. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

c. Whether Defendant properly implemented their purported security measures to protect Plaintiffs' and Class members' Private Information from unauthorized capture, dissemination, and misuse;

d. Whether Defendant took reasonable measures to determine the extent of the Data Breach after they first learned of same;

e. Whether Defendant disclosed Plaintiffs' and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

f. Whether Defendant's conduct constitutes breach of an implied contract;

g. Whether Defendant willfully, recklessly, or negligently failed to maintain and protect its computer systems and data;

h. Whether Defendant was negligent in failing to properly secure and protect Plaintiffs' and the Class's Private Information;

i. Whether Defendant's conduct constitutes breach of confidence;

j. Whether Plaintiffs and Class Members are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

88. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised by the

Data Breach.

89. **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

90. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts. Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

91. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members – whom Defendant has already identified (at least in part), as demonstrated by its quantification of the number of individuals impacted by the Data Breach – demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action. This proposed class action does not present any unique management difficulties.

92. Adequate notice can be given to Class members directly using information maintained in Defendant's records.

93. **Predominance.** The issues in this Action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the

disposition of this matter and the parties' interests therein. Defendant has engaged in a common course of conduct toward Plaintiffs and Class members. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

## VI. CAUSES OF ACTION

### COUNT 1
### NEGLIGENCE

94. Plaintiffs reallege paragraphs 1 through 93 as if same were fully set forth herein.

95. Plaintiffs and Class members provided their Private Information to Persante as a condition of obtaining healthcare services.

96. Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the Private Information of Plaintiffs and Class Members – which Defendant collected from Plaintiffs and Class Members as a condition of providing its services – from being compromised, lost, stolen, accessed, or misused by unauthorized parties.

97. This duty included obligations to take reasonable steps to prevent disclosure of the Private Information, and to safeguard the information from theft. Persante's duties included the responsibility to design, implement, and monitor its data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

98. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, its policies and procedures, and the personnel responsible for them adequately protected the Private Information.

99. Defendant owed a duty of care to safeguard the Private Information due to the foreseeable risk of data breaches and the severe consequences that would result from its failure to safeguard Private Information.

100. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and those individuals who entrusted Defendant with their Private Information, which duty is recognized by laws and regulations, including but not limited to the FTCA, HIPAA, and common law.

101. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

102. Further, Persante had a duty under HIPAA to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

103. Defendant's duty to use reasonable care in protecting Private Information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect Private Information that it acquires, maintains, or stores.

104. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class members could and would suffer if their Private Information were wrongfully disclosed.

105. Defendant had a special relationship with Plaintiffs and Class members. Plaintiffs'

and Class Members' willingness to entrust Persante with Plaintiffs' and Class Members' Private Information as a condition of receiving professional services was predicated on the understanding that Persante would take adequate security precautions to protect that Private Information.

106. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to protect it from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff and Class Members' Private Information; (c) protect against reasonably foreseeable threats to the security or integrity of such information.

107. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information, as alleged and discussed above.

108. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in patient-facing and other consumer-facing industries.

109. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

110. The imposition of a duty of care on Defendant to safeguard the Private Information it maintained, transferred, stored, or otherwise used is appropriate because any (minimal to non-existent) social utility of Defendant's conduct in failing to protect the Private Information is outweighed by the injuries suffered by Plaintiffs and Class Members as a result of the Data Breach.

111. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class

Members are at a current and ongoing imminent risk of identity theft, and Plaintiffs and Class Members sustained compensatory damages, including the following: (i) invasion of privacy; (ii) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the material risk and imminent threat of identity theft; (iv) financial "out of pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring and/or credit monitoring; (ix) anxiety, annoyance, and nuisance, and (x) the continued risk to Private Information, which remains in Defendant's and the threat actors' respective control, and which is subject to further breaches, including for so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' Private Information.

112. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

**COUNT II**
**NEGLIGENCE PER SE**

113. Plaintiffs reallege paragraphs 1 through 93 as if same were fully set forth herein.

114. Pursuant to the Federal Trade Commission Act, 15 U.S.C. section 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members Private Information.

115. Pursuant to HIPAA, 42 U.S.C. section 1302d, 45 C.F.R. section 160 and 164 *et seq.*, Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

116. Pursuant to various state data breach statutes, Defendant had a duty to implement

and maintain reasonable security procedures and practices to protect Plaintiffs' and Class Members' Private Information and to provide prompt notice of any breach.

117. Section 5 of the FTCA, HIPAA, and state data breach statutes establish the relevant standard of care, the violation of which constitutes negligence per se under applicable state law.

118. Defendant breached its duties to Plaintiffs and Class Members under the FTCA, HIPAA, state data breach statutes, and other applicable laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs and Class Members Private Information.

119. Defendant's failure to comply with these applicable laws and regulations constitutes negligence per se.

120. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

121. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

122. As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

123. Plaintiffs reallege paragraphs 1 through 93 as if same were fully set forth herein.

124. In connection with obtaining patient services from Defendant, Plaintiffs and Class

Members entrusted Defendant with their Private Information.

125. Defendant had an implied contract with Plaintiffs and Class Members that it would protect the Private Information it collected from them.

126. Plaintiffs and Class Members were required to deliver their Private Information to Defendant as part of the process of receiving patient services. In doing so, they were of the belief that this information would be safely guarded.

127. Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing patient services to them.

128. Through Defendant's individual provision of patient services, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with Defendant's stated policies and industry best practices.

129. Pursuant to these implied contracts, Defendant agreed to certain implied promises to Plaintiffs and Class Members, including but not limited to the following: (1) taking steps to ensure that anyone who is granted access to Private Information also protects the confidentiality of that data; (2) taking steps to ensure that the Private Information placed in control of Defendant's employees is restricted and limited only to achieve authorized business purposes; (3) restricting Private Information access only to employees and/or agents who are qualified and trained; (4) designing and implementing appropriate retention policies to protect Private Information; (5) applying or requiring proper encryption and/or the separation of different data sets containing Private Information; (6) implementing multifactor authentication for access to Private Information; and (7) taking other steps to protect against foreseeable breaches.

130. By entering into such implied contract, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and

regulations and were consistent with industry standards.

131. Defendant violated these implied contracts and these implied promises by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information.

132. Plaintiffs' and Class Members' Private Information would not have been entrusted to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

133. Plaintiffs and Class Members fully and adequately performed their obligations under their implied contracts with Defendant.

134. Plaintiffs and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein. Plaintiffs and Class Members seek damages, including restitution, actual damages, nominal damages, and any other awardable form of damages, in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(In the Alternative)**

135. Plaintiffs reallege paragraphs 1 through 93 as if same were fully set forth herein.

136. This count is asserted in the alternative to breach of implied contract (Count III).

137. As patients of Defendant, Plaintiffs and Class members conferred a benefit on Defendant, whereby their Private Information was provided to Defendant in the course of providing insurance services to Plaintiffs and Class members.

138. Defendant, prior to and at the time Plaintiffs and Class Members entrusted it with Private Information, caused Plaintiffs and Class Members to reasonably believe that it would keep that Private Information secure.

139. The monies Defendant was paid in its ordinary course of business included a

premium for Defendant's cybersecurity obligations that were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

140. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures in order to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

141. Plaintiff and Class Members have no adequate remedy at law.

142. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred on it.

143. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that Defendant unjustly received from them. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

144. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to the following: (a) actual identity theft; (b) the loss of the opportunity to control how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and

the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures, including for so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that the Court enter judgment against Defendant and in favor of Plaintiffs and the Class, and award the following relief:

A. An order that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. Compensatory, consequential, nominal, and, where permitted by law, statutory and punitive damages in an amount to be determined at trial;

C. Restitution or disgorgement of all amounts obtained by Defendant as a result of its misconduct;

D. Injunctive and declaratory relief requiring Defendant to: (i) implement and maintain improved security measures; (ii) conduct regular third party security audits; (iii) delete or encrypt unnecessary stored Private Information; (iv) provide extended multiyear credit

monitoring and identity theft protection; and (v) comply with applicable regulations;

E. Pre-judgment and post judgment interest;

F. Reasonable attorneys fees, litigation expenses, and costs of suit; and

G. Such other or further relief as the Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Class Action Complaint.

## IX. CERTIFICATION

I hereby certify that to the best of my information and belief, the matter in controversy is not the subject of any other pending in any Court or of a pending Arbitration proceeding and none are contemplated herein between these individual Plaintiff(s) and Defendant(s). I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false that I am subject to punishment.

Dated: December 4, 2025

/s/ Javier Merino, Esq.____________
Javier Merino, NJ Bar No. 078112014
jmerino@dannlaw.com
825 Georges Road, Second Floor
New Brunswick, NJ 08902
Telephone: 201-355-3440

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com
Secondary email: rreinhart@brysonpllc.com

*Attorneys for Plaintiffs and the Proposed Class*

**Pro Hac Vice Application Forthcoming*